# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BIMINI SUPERFAST OPERATIONS LLC, *et al*, <br><br> Plaintiffs, <br><br> v. <br><br> THOMAS WINKOWSKI, Acting Commissioner of U.S. Customs and Border Protection, *et al* <br><br> Defendants. | Civil Action No. 13-1885 (CKK) |

## MEMORANDUM OPINION
(January 10, 2014)

Plaintiffs Bimini Superfast Operations LLC, Bimini Superfast Limited, and Bimini Superfast Charter Limited ("Plaintiffs") have filed suit against Defendant Thomas Winkowski in his official capacity as Acting Commissioner of the United States Customs and Border Protection agency and U.S. Customs and Border Protection ("Defendants" or "CBP"), challenging under the Administrative Procedures Act ("APA") CBP's November 2013 decision prohibiting Plaintiffs from operating their evening "cruise to nowhere" with crewmembers who hold a D-1 nonimmigrant visa. Presently before the Court is Plaintiffs' [13] Motion for a Preliminary Injunction and Defendants' [18] Motion to Dismiss or, in the alternative, for Summary Judgment. Upon consideration of the pleadings[1], the relevant legal authorities, and the

---

[1] Pl.'s Mot. for Prelim. Inj., ECF No. [13]; Def.'s Opp'n. to Pl.'s Mot. for Prelim. Inj. and Def.'s Mot. to Dismiss or for Summ. J., ECF No. [18] ("Def.'s Mot."); Def.'s Stmt. of Material Facts Not in Dispute, ECF No. [18-4] ("Def.'s Stmt."); Pl.'s Reply to Opp'n to Mot. for Prelim. Inj. and Pl.'s Opp'n to Def.'s Mot. to Dismiss, ECF No. [20] ("Pl.'s Opp'n."); Def.'s.Reply to Opp'n to Mot. to Dismiss or for Summ. J., ECF No. [25] (Def.'s Reply); Def.'s Supp. Response

record as a whole, the Court finds that CBP's November 2013 determination was a final agency action, but not an action that violated notice and comment rulemaking procedures under the APA nor an agency action that was arbitrary, capricious, or contrary to the law. Accordingly, Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment is DENIED on the basis that CBP's November 2013 determination was a final agency action, but GRANTED in that, on the merits, the November 2013 determination did not violate APA notice and comment procedures nor was it arbitrary, capricious, or contrary to the law. In light of this decision on the merits, Plaintiffs' Motion for a Preliminary Injunction is DENIED AS MOOT. The Court shall not address Plaintiffs' Motion for Preliminary Injunction in its Memorandum Opinion, but only the Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment.

## I. BACKGROUND

As a preliminary matter, the Court notes that it shall cite to Defendants' Statement of Material Facts not in Dispute, ECF No. [18-4], as these facts were conceded by Plaintiffs.[2] Although Plaintiffs included a footnote in their Opposition to Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment stating that these facts "are very much in dispute," *see* Pl.'s Opp'n, at 5 n. 9, this gesture is insufficient to actually dispute the facts. Plaintiffs were required to respond to Defendants' Statement of Material Facts not in Genuine Dispute as set forth in the rules of the U.S. District Court for the District of Columbia. Plaintiffs did not do so. *See* LCvR 7(h)(1) & (2) ("An opposition to such a motion [for summary judgment] shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as

to Order of Court, ECF No. [26]; Pl.'s Supp. Response to Order of Court, ECF No. [27]; Administrative Record, ECF No. [29].

[2] When a document is part of the administrative record, ECF No. [29], the Court will also cite to the administrative record ("AR").

to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement.").  In any event, the facts presented in Defendants' Statement of Material Facts not in Dispute and relied upon by the Court are either not actually disputed by Plaintiffs or are supported by exhibits provided by both parties along with their pleadings.

## A. *Factual Background*

In 2013, Plaintiffs began a high-speed cruise business using a vessel called "Resorts World Bimini Superfast" that operated out of the Port of Miami.  *See* Def.'s Stmt. ¶ 1.  Between July 20, 2013, and September 15, 2013, Plaintiffs operated two daily cruises between Miami and Bimini where passengers would disembark at the foreign port of Bimini in the Bahamas.  *Id.* ¶ 3, 6.  On August 23, 2013, a representative of Plaintiffs emailed CBP asking whether it could "confirm (in writing if possible) that if we [Plaintiffs] go for the closed loop cruise to Bimini, without any movement of passengers off or on the ship, an ID will be enough for CBP and they will not process the passengers?"  *Id.* ¶ 8; AR 31.  CBP responded that this itinerary was a "cruise to nowhere," meaning a cruise that departs a U.S. port of entry, enters international waters without touching a foreign place, and returns to the same U.S. port of entry with no passengers or crew boarding or departing the vessel, and that this type of cruise would not require CBP processing of passengers.  *Id.* ¶ 9; AR 30-31.  Subsequently, on or around September 21, 2013, Plaintiffs began operating "cruises to nowhere" that departed Miami in the evening, sailed out into international waters, and returned to the port of Miami in the early morning hours.  *Id.* ¶ 10.  Plaintiffs used the same crewmembers to operate the day cruises to Bimini and the evening "cruises to nowhere." Compl. ¶ 70.

On October 23, 2013, Plaintiffs approached the Port Everglades Seaport in Ft. Lauderdale, Florida to inquire about beginning a "cruise to nowhere" that would begin and end at

that port. Def.'s Stmt. ¶ 11. Plaintiffs subsequently informed CBP that they sought to operate a "cruise to nowhere" out of Fort Lauderdale and had been operating the Miami cruise with crewmembers holding D-1 visas. *Id.* ¶ 12. Shortly thereafter, CBP officials requested a meeting to explain to Plaintiffs that if they wished to continue operating "cruises to nowhere," they must employ persons legally authorized to work in the United States since such cruises did not touch a foreign port making the voyage entirely domestic and rendering it ineligible to be crewed by individuals with D-1 visas. *Id.* ¶ 13. CBP officials met with Plaintiffs on October 28, 2013, and communicated this information to Plaintiffs in person. *Id.* ¶ 14.

### B. *Procedural History*

On October 30, Bill Olejasz, CBP Port Director of the Port of Miami, sent Plaintiffs a letter indicating that the crewmembers on Plaintiffs' evening "cruise to nowhere" who possessed D-1 visas were not in compliance with Immigration and Nationality Act ("INA") Section 101(a)(15)(D)(i), which defines a nonimmigrant alien as:

> An alien crewman serving in good faith as such in a capacity required for normal operation and service on board a vessel . . . who intends to land temporarily and solely in the pursuit of his calling as a crewman and to *depart* from the United States with the vessel or aircraft on which he arrived or some other vessel or aircraft.

Compl., Ex. B; AR 13-14 (October 30, 2013 CBP letter) (emphasis added). The October 2013 letter explained that crewmembers on Plaintiffs' "cruise to nowhere" fail to satisfy the "departure" element of INA § 101(a)(15)(D)(i) because, pursuant to a 1955 Board of Immigration Appeals ("BIA") opinion, "one does not depart the United States until one has been admitted into a foreign country or enters foreign territory without inspection." *Id.* As the crewmembers on the evening excursions "will not depart the United States and do not land temporarily and solely in pursuit of their calling as a crewmen [sic]," the crewmembers were not in compliance with the D-1 visa requirements. *Id.* The letter noted that "the CBP has

4

consistently determined that crewmembers who possess D-1 visas are not eligible to work aboard vessels operating as a cruise to nowhere." *Id.* The letter concluded that "in order to operate a cruise to nowhere, the alien crewmembers must be replaced with U.S. citizens and/or lawful permanent residents in order to continue to operate lawfully." *Id.* The CBP granted Plaintiffs a "grace period" until November 3, 2012, "to comply with these requirements" and indicated the contact information of the Miami Director of Field Operations, Vernon Foret, in the event Plaintiffs "wish[ed] to appeal this decision." *Id.*

On November 4, 2013, Plaintiffs sent a letter of appeal to Mr. Foret, which included five pages of legal argument as to why Plaintiffs' "cruise to nowhere" was operating in compliance with United States law. *See* Compl. Ex. C; AR 15-19 (November 4, 2013 Plaintiffs' Appeal Letter). Plaintiffs essentially made two arguments. First, Plaintiffs argued that CBP agency decisions have long held that "cruises to nowhere" are not coastwise trade subject to coastwise laws and thus do not "trigger any U.S. citizen crewing requirement." *Id.* at 3; AR 17. Second, Plaintiffs argued that the D-1 crewmembers are in compliance with the requirements of the INA because the crewmembers "do intend and in fact depart daily [on the cruise to Bimini], enter a foreign port, and enter the U.S. temporarily and solely for the purpose of performing their duties on board the vessel." *Id.* at 4-5; AR 18-19.

Miami Director of Field Operations Vernon Foret denied Plaintiffs' appeal in a letter dated November 7, 2013 ("November 2013 determination"). *See* Compl. Ex. E; AR 22-23 (November 7, 2013 CBP Letter). In his letter, Mr. Foret explained that Plaintiffs' evening "cruise to nowhere" is a "separate, revenue-generating cruise, with its own manifest of paying passengers. . . . It is a distinct voyage of a type that consistently has been denied permission to operate in the Miami Field Office area of responsibility without United States Citizen (USC) or

Lawful Permanent Resident (LPR) crewmen." *Id.* at 1; AR 22. Mr. Foret conceded that "cruises to nowhere" are not considered coastwise trade and that, therefore, requirements imposed by the coastwise laws [which include certain immigration requirements] are not applicable. *Id.* However, Mr. Foret stated that "immigration laws are indeed relevant and applicable to cruises to nowhere." *Id.* Mr. Foret noted that while Plaintiffs' "D-1 crewmen depart the United States foreign each day on the international cruise and are in compliance to operate as crewmen involved in international cruises to and from the Bahamas . . . the D-1 crewman visa status does not allow for these crewmen to operate a separate, revenue-generating cruise to nowhere excursion" and reiterated the reasons set forth in the October 2013 CBP letter. *Id.* at 2; AR 23. In addition, Mr. Foret noted that the applicable regulations, specifically, 8 C.F.R. § 214.2(d)(1), stated that "[a]n alien in this status [D-1 crewman] may be employed only in a crewman capacity on the vessel or aircraft of arrival, or on a vessel or aircraft of the same transportation company, and may not be employed in connection with domestic flights or movements of a vessel." *Id.* Mr. Foret explained "that the cruise to nowhere is a domestic movement of its vessel" and that Plaintiffs' "crewmen are working in the United States, not as crewmen but as employees of a vessel providing entertainment within the United States." *Id.* Mr. Foret found that Plaintiffs' own position that their evening "cruise to nowhere" did not need to comply with manifest and inspections requirements as the vessel and crew were not arriving in the United States because the vessel did not depart the United States supported CBP's position. *Id.* Mr. Foret concluded:

> For these reasons [Plaintiffs'] cruise to nowhere voyages contravene the INA, and these operations must cease until such time as USC or LPR employees are retained to operate those voyages. This office will grant [Plaintiffs] a grace period until November 28, 2013, to comply with these requirements.

*Id.*

On November 22, 2013, Plaintiffs requested and were granted a meeting with senior CBP officials in Washington, D.C. Compl. ¶ 11; Def.'s Stmt. ¶ 22. At the meeting, the CBP officials reiterated to Plaintiffs the position that federal law prevented individuals lacking authorization to work in the United States from operating "cruises to nowhere." Compl. ¶ 11; Def.'s Stmt. ¶ 23.

One day before the end of the grace period, Plaintiffs filed suit in this Court against CBP seeking injunctive and declaratory relief under the Administrative Procedures Act ("APA"). In their Complaint, Plaintiffs alleged that CBP's "newfound position [interpreting INA Section 101(a)(15)(D)(1) and 8 C.F.R. § 214.2(d)(1)] is arbitrary, capricious, and contrary to law" and was issued without an opportunity for notice or comment in violation of the APA. Compl. ¶ 43-44, 76. On December 13, 2013, Plaintiffs filed a Motion for Preliminary Injunction to Preserve the Status Quo Pending Judicial Review and requested that the Court stay the effectiveness of the November 2013 CBP determination pending the outcome of the underlying suit. *See* Preliminary Injunction, ECF No. [13]. On December 20, 2013, in addition to filing their opposition to Plaintiffs' Motion for a Preliminary Injunction, Defendants filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. *See* Defendants' Motion, ECF No. [18]. The original briefing schedule established by the parties and the Court contemplated a decision from the Court by January 6, 2014. However, additional briefing was required from the parties on a discrete issue. In addition, it came to the Court's attention that the Defendant-Government had not filed the administrative record. The Court received the administrative record on January 7, 2014. *See* Administrative Record, ECF No. [29]. On January 10, 2014, the Court issued an Order and Memorandum Opinion explaining the proper scope of the administrative record and approving the record submitted by Defendants on January 7, 2014. *See* Jan. 10, 2014 Order & Mem. Op., ECF Nos. [34], [35]. Accordingly, this matter is now ripe for review.

## II. DISCUSSION

Defendants move the Court to dismiss Plaintiffs' case or, in the alternative, grant summary judgment in Defendants' favor on two bases. First, Defendants argue that CBP's November 2013 decision did not constitute "final agency action" and thus the Court is without subject matter jurisdiction to hear Plaintiffs' claims or, alternatively, must dismiss Plaintiff's case for failure to state a claim under the APA. Second, Defendants argue that Plaintiffs' complaint cannot survive because it is predicated on the assumption that U.S. immigration officials have allowed "cruises to nowhere" to be operated with foreign crewmembers holding only D-1 visas for over 20 years, when in fact CBP has consistently stated the opposite. The Court addresses each basis for Defendants' Motion in turn.

### A. Final Agency Action

Under the APA, only "[a]gency action made reviewable by statute and final agency action for which there is no adequate remedy in a court" is subject to judicial review. 5 U.S.C. § 704. In *Bennett v. Spear*, 520 U.S. 154 (1997), the Supreme Court held that two conditions must be satisfied for a plaintiff to make the threshold showing of final agency action:

> First, the action must mark the "consummation" of the agency's decision making process – it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."

*Id.* at 177-78. In evaluating the finality of a pre-enforcement agency decision, such as the one presently at issue, courts in the D.C. Circuit often evaluate three additional factors set forth in *Ciba-Geigy Corp. v. U.S. E.P.A.*, 801 F.2d 430 (D.C. Cir. 1986) as a complement to the *Bennett* analysis. *See CSI Aviation Services, Inc. v. U.S. Dept. of Transp.*, 637 F.3d 408, 411 (D.C. Cir. 2011). These factors are: (1) whether the agency has "taken a 'definitive' legal position concerning its statutory authority"; (2) whether "the case presented 'a purely legal' question of

'statutory interpretation'"; and (3) whether "the agency's letter imposed an immediate and significant practical burden on [Plaintiff]." *Id.* at 412 (quoting *Ciba-Geigy*, 801 F.2d at 435-37). Defendants argue that CBP's November 2013 determination satisfies none of these conditions.

There is little question that the November 2013 determination met the second *Bennett* condition in so far as it "determined" "rights or obligations" of the Plaintiffs. Based on the specific facts of Plaintiffs' case, the letter clearly made a legal determination that Plaintiffs' "cruise to nowhere voyages contravene the INA" and ordered that "these operations *must cease* until such time as USC or LPR employees are retained to operate those voyages." Compl. Ex. E, at 2; AR 22-23 (emphasis added). The letter also gave a grace period for Plaintiffs to come into compliance with this legal order strongly implying that the agency would bring an enforcement action. In *Sackett v. E.P.A.*, 132 S.Ct. 1367 (2012), the Supreme Court recently found an agency decision to "determine" "legal obligations" in a similar set of circumstances. In *Sackett*, the E.P.A. had sent plaintiffs a pre-enforcement compliance order stating that plaintiffs had violated the Clean Water Act by discharging fill material on their property and directing plaintiffs to "immediately [] undertake activities to restore [their property] in accordance with a Restoration Work Plan" and to "provide and/or obtain access to the Site . . . to EPA employees. . . ." *Id.* at 1371. The Court found the E.P.A. order determined legal obligations because "by reason of the order," plaintiffs were required to "restore" their property and give the E.P.A access to their property even though the E.P.A. had not taken steps to actually enforce the order.[3] *Id. See also*

---

[3] Defendants attempt to distinguish this case from *Sackett* on the basis that penalties do not immediately flow from the November 2013 letter. In *Sackett*, the Court noted that the E.P.A's compliance order had legal consequences because the order itself exposed Plaintiffs to double penalties in a future enforcement proceeding, among other things. *Sackett*, 132 S.Ct. at 1371-2. While this fact was relevant to the Court's analysis, it was not dispositive, which is consistent with the language found in *Bennett:* the agency action must be one by which "rights or

*CSI Aviation Services*, 637 F.3d at 412 (finding Department of Transportation letter to Plaintiff "imposed an immediate and significant burden" on plaintiff on the basis that it informed plaintiff that it had been acting as an unauthorized indirect air carrier in violation of the Federal Aviation Act, "warned" Plaintiff to "cease and desist from any further activity that would result in it engaging in indirect air transportation," and gave Plaintiff a 180-day grace period to comply); *cf.* *Holistic Candlers and Consumers Ass'n v. Food & Drug Admin.*, 664 F.3d 940, 944 (D.C. Cir. 2012) (agency letter did not determine legal obligations where agency letter "requested" that plaintiffs take prompt *voluntary* action, which, if not promptly taken, "may" lead to enforcement actions). Accordingly, the Court finds the November 2013 determination satisfies the second *Bennett* prong.

It is a far closer question, however, as to whether the November 2013 letter marked the "consummation" of the CBP's decision making process. Defendants argue that the November 2013 letter cannot constitute a final agency action because "even if the letters contemplated enforcement actions, CBP has not initiated any such enforcement actions, which would be initiated by a Notice of Intention to Fine [pursuant to 8 C.F.R. § 280.1] (which could be challenged before the BIA), or discretionary determinations by CBP officers regarding the issuance of conditional landing permits." Def.'s Mot. at 14. While the facts of this case do not allow for a clear cut answer on this issue, the Court is persuaded that the *Ciba-Geigy* factors weigh in favor of treating the letter as a final agency action and granting judicial review.

Although Defendants attempt to convince the Court of their position with a lengthy discussion of the several different types of enforcement actions the agency could bring and the

---

obligations have been determined," *or* from which "legal consequences flow." *Bennett*, 520 U.S. at 177-78 (emphasis added).

further administrative review attached to certain of those actions, the Court still finds that CBP has "taken a 'definitive' legal position concerning its statutory authority" that is not subject to "further agency consideration or modification." *Ciba-Geigy*, 801 F.2d at 436-37. Here, upon learning of Plaintiffs' activities, CBP contacted Plaintiffs at the end of October 2013 to inform them that they were unlawfully operating the "cruise to nowhere" with crewmembers holding only D-1 visas. The CBP then sent a formal letter to Plaintiffs outlining the agency's legal position, giving Plaintiffs a three-day grace period in which to comply with the law, and indicating how Plaintiffs could "appeal this decision" to a higher official within CBP in Miami. In response, Plaintiffs sent a five-page appeal letter with legal argument to the Miami Director of Field Operations who denied the appeal in a November 2013 letter and in no uncertain terms reiterated at length CBP's position that Plaintiffs had violated the law and were continuing to do so. The November 2013 letter further ordered Plaintiffs to "cease" operations until they were in compliance with immigration law and gave Plaintiffs a twenty-one-day grace period in which to comply. Plaintiffs then met with senior CBP officials in Washington, D.C. who confirmed the agency's position. These facts are similar to the facts on which the Court of Appeals for the D.C. Circuit relied in the case of *CSI Aviation Services* when the appellate court found that the Department of Transportation ("DOT") had issued a "definitive" statement of the agency's legal position. *CSI Aviation Services*, 637 F.3d at 412 (quoting *Ciba-Geigy*, 801 F.2d at 437). In *CSI Aviation Services*, the DOT sent CSI a letter indicating that it had been acting as an unauthorized indirect air carrier in violation of the Federal Aviation Act. *Id.* at 410. The agency "warned" CSI to "cease and desist" from any further activity that would result in engaging in indirect air transportation" and gave CSI a grace period to bring their activities into compliance with the law. *Id.* CSI submitted a petition to DOT for an exemption from the certification requirement and

presented legal arguments as to why DOT's interpretation of the law was misguided. *Id.* DOT granted CSI a temporary exemption, but indicated in the exemption order that DOT retained the same legal view. *Id.* at 411. CSI then filed suit in district court prior to the expiration of the temporary exemption. *Id.* In finding DOT to have taken a final action, the appellate court relied upon the fact that DOT had issued a "definitive" statement when it "declared in no uncertain terms" that CSI had violated the law in its initial warning letter and reiterated that position after CSI protested and presented its legal argument as to why DOT was misinterpreting the law. *Id.* at 412. The appellate court found that the warning letter and exemption order "gave no indication that [the agency's legal position] was subject to further agency consideration or possible modification." *Id.*

Likewise here, CBP's November 2013 letter did not simply make a "preliminary determination" that Plaintiffs conduct was unlawful, *see Reliable Automatic Sprinkler Co., Inc. v. Consumer Product Safety Commission*, 324 F.3d 726, 730 (D.C. Cir. 2003), or suggest that further information and agency deliberation was required before the agency could definitively determine the conduct was unlawful, *see Holistic Candlers*, 664 F.3d at 944. Instead, CBP, in its communications with Plaintiffs, repeatedly stated "in no uncertain terms" that Plaintiffs' conduct violated federal immigration laws. *CSI Aviation Services,*637 F.3d at 412. *See also City of Dania Beach v. FAA*, 485 F.3d 1181, 1188 (D.C. Cir. 2007) (finding an agency letter to constitute final agency action where "[n]othing in the letter indicate[d] that the [agency's] statements and conclusions [were] tentative, open to further consideration, or conditional on future agency action."). Accordingly, as the Court of Appeals did in *CSI Aviation Services Inc.*, this Court finds that CBP has given a "definitive" legal position. *Ciba-Geigy*, 801 F.2d at 437.

Defendants argue, however, that CBP's position *is* subject to further agency consideration because Plaintiffs "have administrative remedies and an administrative appeal process available to them." Def.'s Reply at 7 (emphasis added). Specifically, Defendants cite to 8 C.F.R. § 280.12, which states that within thirty days of receiving a Notice of Intention to Fine, any person upon whom such a notice has been served "may file" a "written defense setting forth the reasons why a fine should not be imposed," and § 1280.1(b), giving the Board of Immigration Appeals "appellate authority to review DHS decisions involving fines." However, the facts relevant to CBP's position are undisputed and thus CBP's position represents a "purely legal" question of "statutory interpretation"—the second *Ciba-Geigy* factor to consider. Thus, even if Plaintiffs "may" file a written defense after receiving a Notice of Intention to Fine, "in the absence of disputed facts that would bear on the statutory question, there [is] no benefit in waiting for the agency to develop a record for granting judicial review." *CSI Aviation Services*, 637 F.3d at 411; *cf. Reliable Automatic Sprinkler*, 324 F.3d at 734 (finding no final agency action in part because the question whether the statutory term 'consumer product' included plaintiff's sprinkler heads, and thus gave the Commission statutory authority to regulate plaintiff, was not a purely legal one, since the application of the statutory term to the sprinkler heads would "clearly involve the resolution of factual issues and the creation of a record").

Furthermore, in this case, any review or appeal under these regulations would presumably focus on the grounds for imposing a specific fine, not the legal question at issue here. *Cf. Reliable Automatic Sprinkler*, 324 F.3d at 733 ("a hearing before the Commission will not be an idle gesture, because the agency has made it clear that the interpretation of "consumer product" with respect to sprinkler heads remains to be determined."). Indeed, the further agency action available here is distinct from the type of agency action that courts have found to preclude a

finding that the agency decision making process has been "consummated." For example, in *Holistic Candlers*, the Court of Appeals for the D.C. Circuit found the FDA's letter was not a final agency action because the agency "may only ban devices after going through a formal process that it has not undertaken here." 664 F.3d at 945. Likewise, in *Reliable Automatic Sprinkler*, the Court of Appeals found no final agency action where the Consumer Product Safety Commission issued a preliminary determination that plaintiff's sprinklers violated the law, but was required by statute to bring a formal, on-the-record adjudicative administrative proceeding before it could make any legally binding determination. 324 F.3d at 731-32. Importantly, even though plaintiff in that case sought a declaratory judgment that the Commission was acting outside its jurisdiction—a largely legal question—the appellate court found that the Commission had "not as yet made a record determination that it has jurisdiction over [plaintiff's] sprinkler heads," which it could only do by filing an administrative complaint. *Id.* at 730. In these cases, further agency procedures were required before the agency could even make a definitive decision about the legality of the plaintiffs' actions. Here, CBP's declarations of Plaintiffs unlawfulness are not conditioned on further agency action. Having definitively declared the illegality of Plaintiffs' activities, any further agency action—if Plaintiff chooses to engage in it—comes at the enforcement stage. There is no indication that any such enforcement process would change CBP's legal position or require that an agency record be developed given the purely legal nature of CBP's position.

Defendants also argue that "other enforcement options are available under the statute," such as "simply ordering the crew to be detained on board or removed [under 8 U.S.C. §§ 1282, 1284(a)(2)] without ever issuing any penalties" and thus Plaintiffs do not necessarily face any imminent penalties from CBP's November 2013 letter. Def.'s Reply at 7. As an initial matter,

the Court fails to see how 8 U.S.C. § 1284(a)(2) and § 1282(b) do not penalize the employer since both provisions require an employer to detain an employee on board and the latter requires the master or commanding officer of the vessel on which the illegal crewman arrived to, in addition, "remove[] [the crewman] from the United States at the expense of the transportation line which brought him to the United States" and bear "the expenses of his detention" until removed. Furthermore, if Defendants choose to take this enforcement action against Plaintiffs, it is unclear to the Court, and the Defendants have not indicated, what administrative review, if any, would occur before the CBP took that action. In any event, as described above, the CBP has definitively stated its statutory authority for determining that Plaintiffs are employing illegal crewman, and that position is based on undisputed facts and a statutory interpretation which will not be aided by any further administrative deliberations.[4]

The Supreme Court in *Bennett* "highlight[ed] the importance of avoiding disruption of the administrative decisionmaking process, but it d[id] not foreclose all pre-enforcement challenges." *CSI Aviation Services*, 637 F.3d at 411. Where, as here, CBP has taken an action which imposes a clear legal obligation on Plaintiffs to cease their operations until their

---

[4] Defendants also argue that Plaintiffs fail to state a claim under the APA because the APA only allows review of final agency action "for which there is no adequate remedy in a court." 5 U.S.C. § 704. However, in making their argument, Defendants only argue that there are other administrative remedies available to Plaintiffs, apparently forgetting that the statutory language only speaks of "adequate remed[ies] *in a court*." The Supreme Court has affirmed that the analysis of "adequate remedies" is limited to remedies in a court. *See Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (explaining that "[w]hen Congress enacted the APA to provide a general authorization for review of agency action in the district courts, it did not intend that general grant of jurisdiction to duplicate the previously established special statutory procedures relating to specific agencies," such as statutes setting out that "Federal Trade Commission and National Labor Relations Board orders were directly reviewable in the regional courts of appeals, and Interstate Commerce Commission orders were subject to review in specially constituted three-judge district courts."); *see also Sackett*, 132 S.Ct. at 1372 (finding that there was "no other adequate remedy in a court" because plaintiffs did not have alternative routes to "judicial review," specifically they could not initiate a civil action in court under the Clean Water Act). Accordingly, Defendants' argument on this point is unavailing.

crewmembers are in compliance with federal immigration law, and expressed a definitive position that presents a legal question of statutory interpretation that is not conditioned on or subject to modification by further agency action, the Court is assured that it can treat this pre-enforcement agency action as final without disruption of the administrative decisionmaking process.[5]

## B. Merits of CBP's November 2013 Determination

The Court now turns to Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment on the merits of Plaintiffs' underlying complaint. Although styled in the alternative as a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), both parties rely on materials, notably affidavits, that are outside the scope of the pleadings. Federal Rule of Civil Procedure 12(d) requires a motion to dismiss under Rule 12(b)(6) to be treated as a motion for summary judgment, "if matters outside the pleadings are presented to, and

---

[5] Defendants argue that the Court should dismiss Plaintiffs' action under either Fed. R. Civ. P 12(b)(6), for failure to state a claim under the APA, which requires final agency action in order for a plaintiff to have a cause of action, or under Fed. R. Civ. P. 12(b)(1), because some panels in this Circuit have held that the issue of whether an agency action is final under the APA is jurisdictional. Indeed, from the 1980s to 2005, the Court of Appeals for the D.C. Circuit repeatedly held that the APA's reviewability provisions were jurisdictional notwithstanding a footnote in a Supreme Court opinion, *Air Courier Conference v. Am. Postal Workers Union,* 498 U.S. 517, 523 n. 3 (1991), observing that the judicial review provisions of the APA are not jurisdictional. *See, e.g., Indep. Petroleum Ass'n of Am. v. Babbitt,* 235 F.3d 588, 594 (D.C. Cir. 2001). However, since 2006, and the Court of Appeals' decisions in *Center for Auto Safety v. NHTSA,* 452 F.3d 798, 805 (D.C. Cir. 2006), and *Trudeau v. FTC,* 456 F.3d 178 (D.C. Cir. 2006), panels have held with increasing confidence that whether an agency action is final under the APA is not a jurisdictional question. *See, e.g., Vietnam Veterans of America v. Shinseki,* 599 F.3d 654, 661 (D.C. Cir. 2010) ("We think the proposition that the review provisions of the APA are not jurisdictional is now firmly established."). In any event, this distinction is irrelevant because the Court finds CBP's November 2013 determination was a final agency action and grants Defendants' Motion on their alternative basis—that CBP's interpretation of federal immigration law did not violate notice and comment requirements and is not arbitrary and capricious.

not excluded by the court." Plaintiffs do not contend that there are any facts in material dispute and do not contest that Defendants' Motion should not be treated as a motion for summary judgment. Accordingly, the Court shall treat Defendants' Motion solely as one for summary judgment.

### 1. Legal Standard

Plaintiff's Complaint challenges the CBP's November 2013 determination as violating notice and comment procedures and as being "arbitrary, capricious, and contrary to the law." Compl. ¶ 43-44, 76.

### a. Review of Agency Determinations under the APA

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." However, "when a party seeks review of agency action under the APA [before a district court], the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson,* 269 F.3d 1077, 1083 (D.C. Cir. 2001). Accordingly, "the standard set forth in Rule 56 does not apply because of the limited role of a court in reviewing the administrative record . . . Summary judgment is [ ] the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Southeast Conference v. Vilsack,* 684 F.Supp.2d 135, 142 (D.D.C. 2010).

A reviewing court can set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (C), (D). An agency's decision may be arbitrary or

capricious if any of the following apply: (i) its explanation runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference of view or the product of agency expertise; (ii) the agency entirely failed to consider an important aspect of the problem or issue; (iii) the agency relied on factors which Congress did not intend the agency to consider; or (iv) the decision otherwise constitutes a clear error of judgment. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983); *accord Jicarilla Apache Nation v. U.S. Dep't of Interior,* 613 F.3d 1112, 1118 (D.C. Cir. 2010).

In addition, "[a]s a general matter, an agency's interpretation of the statute which that agency administers is entitled to *Chevron* deference." *Fox v. Clinton,* 684 F.3d 67, 75 (D.C. Cir. 2012) (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837 (1984)). In the first step of the *Chevron* analysis, the Court reviews the statute *de novo* to determine whether or not the statute is ambiguous. *Id.* at 842–43. If the statute is ambiguous, the Court then must defer to the agency's interpretation of the statute unless it is "manifestly contrary to the statute." *Id.* at 844. Thus, the inquiry for the Court under the second step of *Chevron* is whether the agency's interpretation of Congress' instructions is reasonable. The Court's inquiry under the second step of *Chevron* "overlaps with [the Court's] inquiry under the arbitrary and capricious standard." *Am. Fed'n of Gov't Employees, AFL–CIO, Local 446 v. Nicholson,* 475 F.3d 341, 345–46 (D.C. Cir. 2007). "Whether a statute is unreasonably interpreted is close analytically to the issue whether [sic] an agency's actions under a statute are unreasonable." *Gen. Instrument Corp. v. Fed. Commc'ns Comm'n,* 213 F.3d 724, 732 (D.C. Cir. 2000).

Plaintiff, as the party challenging the agency action, bears the burden of proof. *Abington Crest Nursing & Rehab. Ctr. v. Sebelius,* 575 F.3d 717, 722 (D.C. Cir. 2009) (citing *City of Olmsted Falls v. Fed. Aviation Admin.,* 292 F.3d 261, 271 (D.C. Cir. 2002)). In assessing the

merits of Plaintiff's challenge, the Court begins with the presumption that the agency's actions were valid. *Grid Radio v. Fed. Commc'ns Comm'n,* 278 F.3d 1314, 1322 (D.C. Cir. 2002). So long as the agency decision has some rational basis, the Court is bound to uphold it. *Hosp. of Univ. of Penn. v. Sebelius,* 634 F.Supp.2d 9, 13 (D.D.C. 2009) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971)).

### b. Notice and Comment Rulemaking Requirements

Notice and comment rulemaking procedures are required under the APA when substantive rules are promulgated, *modified*, or revoked. *American Tort Reform Ass'm v. OSHA*, --- F.3d ---, 2013 WL 6818711, *6 (D.C. Cir. 2013) (citing 5 U.S.C. § 553) (emphasis added). The APA defines a "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes . . . practices bearing on any of the foregoing." 5 U.S.C. § 551(4). Substantive or legislative rules are those that "grant rights, impose obligations, or produce other significant effects on private interests," *Batterton v. Marshall,* 648 F.2d 694, 701–02 (D.C. Cir. 1980) (citations omitted), or which "effect a change in existing law or policy," *Alcaraz v. Block,* 746 F.2d 593, 613 (9th Cir. 1984) (quotations omitted). Interpretative rules, general statements of policy, and rules of agency organization, procedure, or practice, however, are expressly excluded from the APA's notice and comment requirements for rulemaking. *See* 5 U.S.C. § 553(b).

### 2. Discussion

Plaintiffs argue that in determining Plaintiffs' "cruise to nowhere" could not be manned by foreign crewmembers holding only D-1 visas, CBP reversed its "longstanding administrative interpretation and practice" under the Passenger Vessel Services Act ("PVSA") and the INA,

permitting the operation of cruises to nowhere using foreign crews. Compl. ¶¶ 2-5; Pl.'s Opp'n. at 20. Plaintiffs allege that CBP's decision to reverse its prior interpretation in the November 2013 letter violated notice and comment rulemaking requirements and was arbitrary, capricious, and contrary to the law. Compl. ¶ ¶ 43-44, 76. As evidence that CBP's November 2013 determination represented a modification of CBP's "longstanding interpretation and practice" regarding "cruises to nowhere," Plaintiffs point to (1) United States Customs rulings interpreting the PVSA, and (2) CBP general practices and specific assurances suggesting that Plaintiffs could operate their "cruise to nowhere" with a foreign crew. Defendants respond that the November 2013 determination "simply refined the contours of an already existing legal norm set forth in the [INA], [Immigration and Naturalization Service] General Counsel Opinions from 1989 and 1991, BIA precedent from 1955, and the agency's regulations," which have consistently required that all "cruises to nowhere" abide by federal immigration law. Def.'s Mot. at 22, 27. The Court begins by considering the evidence presented by Plaintiffs before turning to Defendants' evidence and determining whether CBP's November 2013 determination violated notice and comment requirements or was arbitrary, capricious, or contrary to the law.

### a. CBP Interpretations of Coastwise Laws

In arguing that CBP's "longstanding position" has been to permit "cruises to nowhere" manned by foreign crewmembers, Plaintiffs rely primarily on United States Customs rulings holding that "cruises to nowhere" are "not considered coastwise trade" and thus non-coastwise qualified vessels are permitted to operate such cruises. Defendants concede in their November 2013 determination that "cruises to nowhere" are not considered coastwise trade and "therefore, requirements imposed by coastwise laws are not applicable." Compl. Ex. E; AR 22-23 (November 7, 2013 CBP Letter), at 1. However, this concession and these specific U.S. Customs rulings are inapposite. The rulings on which Plaintiffs rely only answer the specific

question of whether a "foreign-flagged vessel" can operate a "cruise to nowhere" in light of the PVSA's prohibition of foreign vessels in coastwise trade. None of the rulings mention, much less opine, on the question of foreign crewmembers and their authorization to work on such cruises. *See* HQ 111490 (Feb. 27, 1991); HQ 112216 (May 20, 1992); HQ 113846 (May 5, 1997); HQ HO55001 (March 20, 2009). Plaintiffs concede as much in their pleadings: "it is certainly true that the CBP prior rulings . . . do not opine specifically on the issue of D-1 crewmembers." Pl.'s Opp'n. at 28. Nevertheless, Plaintiffs argue that since the rulings "all concern non-coastwise qualified [i.e. foreign] vessels, which are commonly understood to have a crew that is primarily if not exclusively foreign" the rulings should be read as allowing foreign-crewed vessels to conduct "cruises to nowhere." *Id.*; *see also id.* at 20 ("In each of these [rulings], CBP knew or should have known that the crews of those vessels were likely also foreign, without mentioning the latter fact."). In essence, Plaintiffs argue that in repeatedly ruling pursuant to the coastwise statute that foreign-*flagged* vessels could operate "cruises to nowhere" CBP was actually "definitively" determining that foreign-*crewed* vessels could operate "cruises to nowhere" pursuant to all applicable laws.

The Court finds that Plaintiffs' argument, which is based on an alleged "common understanding," is grossly insufficient to show that CBP has had a "longstanding" policy of allowing "cruises to nowhere" to be operated by foreign crews.[6] At most, one could infer from

---

[6] To further support their reasoning, Plaintiffs point to remarks made by Congressman Gerry Studds in relation to a bill introduced in the 103rd Congress that Plaintiffs claim was "designed to amend the PVSA to bring cruises to nowhere within the definition of coastwise trade."

> [U]nder an unusual interpretation by the Customs Service, if a vessel leaves a U.S. port, sails beyond the 3-mile territorial sea, and returns to the original port, then it can be foreign-flag, built in a subsidized foreign shipyard, owned by foreign citizens, and manned by low wage foreign personnel.

the U.S. Customs rulings that by interpreting "cruises to nowhere" as non-coastwise trade, CBP has interpreted such cruises as being exempt from all coastwise trade laws including the coastwise laws that impose citizenship requirements on certain vessels. However, even if Plaintiffs can argue that the CBP has long held that "cruises to nowhere" are exempt from the citizenship requirements of *coastwise trade laws*, this does not mean that such cruises are exempt from *federal immigration laws*. The Court finds nothing in the U.S. Customs rulings that can be read as exempting "cruises to nowhere" from federal immigration laws. Moreover, Defendants present strong evidence that the CBP (and formerly the INS) has in fact long interpreted federal immigration laws to apply to "cruises to nowhere" and their crewmembers. *See, e.g., M/V Southern Elegance*, 1 Imm. & Natural. Serv. & Dep't of Justice Legal Op. § 91-4 (Jan. 11, 1991) ("Employment of aliens on board the Southern Elegance to conduct "cruises to nowhere" must be done in compliance with the immigration laws of the United States."). As Plaintiffs cannot even point to a U.S. Customs ruling stating that "cruises to nowhere" can be manned by foreign crew, much less a ruling opining that federal immigration laws do not apply to "cruises to nowhere," Plaintiffs cannot argue that CBP's November 2013 determination applying federal immigration law to Plaintiffs' "cruise to nowhere" represents a "significant revision" to the

_____

139 Cong. Rec. H 10-391 (Nov. 20, 1993). Plaintiffs also point to similar remarks made by Congressman Jack Fields. *See* Pl.'s Opp'n. at 2 n. 4. The Court does not find these citations persuasive. These remarks occurred in the context of legislation that Congress considered but failed to enact. Furthermore, CBP is not bound by the opinions of a member of Congress on a statute; nor is the opinion of a Member of Congress authoritative as to the agency's position. *See United States* v. *Southwestern Cable Co.*, 392 U.S. 157, 170 (1994) ("[T]he views of one Congress as to the construction of a statute adopted many years before by another Congress have very little, if any, significance."). Moreover, the Congressmen's statements dealt with an interpretation of the PVSA and do not address any application of federal immigration law to "cruises to nowhere."

CBP's prior interpretation of "cruises to nowhere" that requires notice and comment procedures. *Cf. Alaska Professional Hunters Ass'n, Inc. v. F.A.A.*, 177 F.3d 1030 (D.C. Cir. 1999) (holding notice and comment procedures were required when FAA sent "Notice to Operators" that guide pilots were required to abide by FAA regulations applicable to commercial air operations when FAA had previously and consistently advised guide pilots that they were not governed by regulations dealing with commercial pilots).

### b. CBP Representations and Practice

As part of their argument that CBP's November 2013 letter represented a significant change in CBP's policy regarding foreign crewmen on "cruises to nowhere," Plaintiffs also suggest that throughout the business planning process, Plaintiffs "relied on CBP's approval and acquiescence in structuring . . . its operations" to include "cruises to nowhere" manned by foreign crewmembers. Pl.'s Opp'n. at 6. Plaintiffs further state that "it is also common knowledge in the industry that CBP has for many years permitted non-coastwise vessels to operate cruises to nowhere with crews consisting of D-1 visa holders." Lopez Affidavit, ECF No. [22], at ¶ 10. Essentially, Plaintiffs appear to be arguing that, in light of these assurances and practices, CBP cannot now enforce a contrary policy without complying with notice and comment procedures. The Supreme Court has repeatedly rejected such arguments admonishing for many years that "equitable estoppel will not lie against the Government as it lies against private litigants." *OPM v. Richmond,* 496 U.S. 414, 419 (1990) (citing cases). "[A]lthough the Court has declined to hold that there are no circumstances in which estoppel may run against the government, it has made clear that the bar for succeeding on such a claim is high." *Millard Refrigerated Services, Inc. v. Secretary of Labor*, 718 F.3d 892, 897-98 (D.C. Cir. 2013) (citing *Richmond*, 496 U.S. at 421-23); *see also Richmond,* 496 U.S. at 421-22 (noting that the Court's opinions have "mention[ed] the possibility, in the course of rejecting estoppel arguments, that

some type of 'affirmative misconduct' might give rise to estoppel against the Government."). Plaintiffs cannot reach this high bar because they offer no evidence that they requested prior permission to use a crew comprised of crewmembers holding D-1 visas—or even mentioned the status of the crew—and that CBP approved or acquiesced to that crew status. At most, the correspondence included in the administrative record shows Plaintiffs asked CBP officials about the agency's need to inspect the *passengers* on a "cruise to nowhere," for which CBP confirmed there was no need. AR 30-32; Def.'s Stmt. ¶ 8. However, CBP's confirmation in no way addresses the vessel's *crew* and is not inconsistent with the agency's position that D-1 crewmen cannot be employed upon a "cruise to nowhere." Plaintiffs also submitted with their pleadings an affidavit from Bimini SuperFast Operations Director of Security Jose Lopez in which he contends that "[t]here is no question that CBP knew that our crew was foreign because the CBP regularly conducted (and continues to conduct) inspections of the vessel and its crew where the crew must disembark and be interviewed prior to returning to the vessel." Lopez Affidavit, at ¶ 14. However, Mr. Lopez's suggestion that CBP knowingly acquiesced to Plaintiffs' employing foreign crewmembers on their "cruises to nowhere" is based on pure speculation and supposition.

The same is true of Mr. Lopez's assertion that it is "common knowledge in the industry that CBP has for many years permitted non-coastwise vessels to operate cruises to nowhere with crews consisting of D-1 visa holders." *Id.* ¶ 10. Neither Mr. Lopez nor Plaintiffs offer any support for what ultimately remains a bald assertion by Mr. Lopez. In his affidavit, Senior Vice President of Bimini SuperFast Operations Gregory Karan states that he was general manager of another cruise vessel that operated "cruises to nowhere" manned by all foreign crew with D-1 visas. Karan Supp. Affidavit, at ¶ 2. However, Mr. Karan's assertion is also no more than a bald

assertion based in part on hearsay and for which he offers no support. Furthermore, Mr. Karan's affidavit offers no indication that his previous cruise line's activities came to the attention of the CBP. In light of the fact that the Court has before it opinions where the INS did not allow D-1 crewmen to operate "cruises to nowhere" when such operations came to the agency's attention, the Court finds Mr. Karan's assertion unpersuasive in establishing CBP policy or practice. Moreover, "unless Congress has indicated otherwise," agencies charged with enforcing the law retain discretion not to prosecute every violation that comes to their attention. *Millard Refrigerated Services*, 718 F.3d at 898 (quoting *Heckler v. Chaney,* 470 U.S. 821, 838 (1985)). Accordingly, having presented no evidence that could give rise to estoppel against the government or otherwise establish a definitive practice by CBP, Plaintiffs have failed to show that the CBP's November 2013 letter significantly revised its legal interpretation and thus required an opportunity for notice and comment.

### c. Interpretation of INA

As Plaintiffs' arguments are unavailing that CBP's November 2013 determination represents an abrupt departure from the CBP's prior interpretations of the coastwise laws or from CBP's prior immigration enforcement activities, Plaintiffs' only remaining argument is that the November 2013 determination is a significant modification of CBP's interpretation of the INA. In its November 2013 determination, CBP notes that it has "consistently taken the position that applicable [immigration] law allows for the operation of a cruise to nowhere from a United States port only when the crew consists of USC and/or LPR crewmen." AR 22. CBP acknowledges that Plaintiffs' crewmembers are in compliance to operate as D-1 crewmen on the daily cruise to Bimini, but not the "cruise to nowhere" which "is a separate, revenue-generating cruise, with its own manifest of paying passengers." *Id.* at 22-23. CBP explains that the

crewmen on this "distinct voyage" fail to satisfy the requirements of INA § 101(a)(15)(D)(i)—
which they must satisfy in order to be bona fide D-1 visa holders—because "the crewmen do not
depart the United States and do not land temporarily and solely in pursuit of their calling as
crewmen on this specific excursion." *Id.* at 23. The CBP further notes that 8 C.F.R. §
214.2(d)(1) does not permit an alien in D-1 status "to be employed in connection with domestic
flights or movements of a vessel or aircraft." *Id.*

To support their argument that this position has consistently been applied, Defendants
point to three INS General Counsel opinions holding that D-1 crewmen cannot operate "cruises
to nowhere" because they do not "depart" from the United States. *See* AR 1-12 (*Mistral II,* 1
Imm. & Natural. Serv. & Dep't of Justice Legal Op. § 89-49 (June 21, 1989); *M/V Southern
Elegance*, 1 Imm. & Natural. Serv. & Dep't of Justice Legal Op. § 91-4 (Jan. 11, 1991); *M/V
Merchant Victor*, Genco Op. No. 94-26, 1994 WL 1753130 (June 6, 1994)). Plaintiffs concede
that these opinions all support the proposition that "foreign crewmembers cannot rely on cruises
to nowhere alone to qualify for D-1 status."[7] Pl.'s Opp'n. at 25. Consequently, the Court fails to
see how the CBP's November 2013 determination that a distinct "cruise to nowhere" cannot be
operated by crewmen in D-1 status represents a significant "modification" to CBP's longstanding
position regarding "cruises to nowhere" operated by foreign crewmembers. Plaintiffs further
argue that CBP's reliance on 8 C.F.R. § 214.2(d)(1)'s prohibition of D-1 status crewmen
operating the "domestic movements" of a vessel is clearly a modification of CBP's longstanding
position that "cruises to nowhere" are not coastwise trade. But, here again, Plaintiffs confuse

---

[7] Technically, Plaintiffs only concede that the *M/V Southern Elegance* and *Mistral II*
opinions support this proposition. However, Plaintiffs acknowledge that the *M/V Merchant
Victor* opinion held that a vessel was allowed to operate with D-1 crewmen because it sailed to a
foreign port. Plaintiffs only dismiss the opinion because it is based on the "narrow and esoteric
ground that ports in the Virgin Islands may be treated as foreign ports under particularized
circumstances." *See* Pl.'s Opp'n. at 23.

CBP's interpretations of coastwise laws with the agency's interpretation of distinct immigration laws which have their own distinct purposes. Accordingly, the Court finds that Plaintiffs have failed to present evidence that CBP has done anything but consistently interpret and apply the immigration statutes within its authority. The Court holds that CBP did not violate the APA's notice and comment rulemaking requirements in issuing its November 2013 determination. *See Alaska Professional Hunters Ass'n*, 177 F.3d at 1034 ("When an agency has given its regulation a definitive interpretation, and later *significantly revises* that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and comment." (emphasis added)); *Shalala v. Guernsey Memorial Hosp.,* 115 S.Ct. 1232, 1239 (1995) (explaining that APA rulemaking is required where an interpretation "adopt[s] a new position inconsistent with . . . existing regulations.").

Furthermore, based on the agency record, the Court finds that CBP's November 2013 determination was not arbitrary, capricious, or contrary to the law. Again, it is important to note that Plaintiffs do not dispute the CBP's interpretation of INA 101(a)(15)(D)(i) as not permitting D-1 visa crewmen to operate "cruises to nowhere" because they do not "depart" the United States as required by the statute. *See* Pl.'s Opp'n. at 25. Likewise, Defendants do not dispute that Plaintiff's crewmen properly hold D-1 visas for the daily cruise to Bimini because they actually depart the United States to a foreign port. *See* Pl.'s Ex. E (November 7, 2013, CPP letter). Plaintiffs argue, however, that because the crewmen operating the evening "cruises to nowhere" depart "virtually every single day" for the foreign port of Bimini they are in compliance with the D-1 visa's requirement that the crewmen "intend to land temporarily" and "depart from the United States." Pl.'s Opp'n. at 25. Essentially, Plaintiffs try to broaden the interpretation of the statutory term "depart" by attaching the separate "cruise to nowhere"

operation onto the daily cruise to Bimini. Plaintiffs, however, offer no legal support for this analysis of their "cruise to nowhere." Plaintiffs only argue that unlike the "cruise to nowhere" crew in *M/V Southern Elegance* who could not show they intended to remain in the United States only temporarily because they lived in apartments on shore and only departed to a foreign port once a month solely for the purpose of complying with the D-1 visa requirements, the crewmen on Plaintiffs' vessel live onboard and genuinely intend to engage in foreign commerce by conducting daily cruises to Bimini. Pl.'s Opp'n. at 26. However, the *M/V Southern Elegance* opinion in no way affirmatively states that if crewmembers on a distinct "cruise to nowhere" voyage also operate a separate, legitimate daily foreign cruise they will be considered to be properly operating the "cruise to nowhere" on a D-1 visa. Indeed, this interpretation would appear to be contrary to 8 C.F.R. § 214.2(d)(1), which states that an alien who qualifies for INA section 101(a)(15)(D)(i) "may be employed only in a crewman capacity on the vessel or aircraft of arrival, or on a vessel or aircraft of the same transportation company, and may not be employed in connection with domestic flights or movements of a vessel or aircraft." Nevertheless, even if the statute is ambiguous, under *Chevron,* the Court must defer to the agency interpretation unless it is "manifestly contrary to the statute." *Chevron,* 467 U.S. at 844. Here, CBP's view is not "manifestly contrary" to the provision of the statute at issue as the provision, which focuses on a crewman's intent to "land temporarily" and "depart," in no way precludes an interpretation of the landing and departure as applying to each distinct voyage of the vessel. Moreover, Plaintiffs' interpretation would effectively allow alien crewmen to work in the United States without proper authorization so long as the vessel they operated occasionally departed on a legitimate foreign cruise, effectively skirting immigration employment laws. Accordingly, in light of the deference the Court must give the agency's interpretation, Plaintiffs'

failure to point to any legal authority affirmatively supporting their analysis, and U.S. Custom's consistent opinions holding that crewmembers are not in compliance with their D-1 visa status when they operate "cruises to nowhere," the Court has no difficulty concluding that CBP's November 2013 determination was not arbitrary, capricious, or contrary to law.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment is DENIED in that CBP's November 2013 determination was a final agency action, but GRANTED on the basis that the November 2013 determination did not violate notice and comment rulemaking procedures and was not arbitrary, capricious, or contrary to the law. Accordingly, Plaintiffs' Motion for a Preliminary Injunction is DENIED AS MOOT.   An appropriate Order accompanies this Memorandum Opinion.

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge